729 F.2d 238
 15 Fed. R. Evid. Serv. 204
 Coriner WHITEHEAD
v.
ST. JOE LEAD COMPANY, INC., St. Joe Minerals Corporation,
Tonolli Corporation, RSR Corporation, Industrial Powdered
Metals, Inc., Connecticut Engineering Association
Corporation, Alcan Ingot & Powders, Division of Alcan
Aluminum Corporation, Alcan Aluminum, Ltd., and Compagnie
Francais De L'Etain.
TONOLLI CORPORATION, Defendant-Third Party Plaintiff,
v.
ALPHA METALS, INC., Third Party Defendant,
Coriner Whitehead, Appellant.
 No. 83-5179.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 27, 1984.
Decided Feb. 28, 1984.
 
 Alan L. Krumholz (argued), Pearlman, Krumholz, Horn & Shechtman, P.A., Jersey City, N.J., for Coriner Whitehead.
 Richard E. Snyder (argued), Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, Livingston, N.J., for St. Joe Lead Co., Inc.
 J.P. Janetatos (argued), Baker & McKenzie, Washington, D.C., for Tonolli Corp.; Stephen A. McLaughlin, Washington, D.C., of counsel.
 Kenneth P. Westreich (argued), Conway & Reiseman, Roseland, N.J., for RSR Corp.
 Before GIBBONS and BECKER, Circuit Judges, and DUMBAULD, District Judge*.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 Coriner Whitehead appeals from an order of the district court entering summary judgment against her. These claims arise out of Whitehead's contamination by lead particles caused by her exposure to lead during the course of her employment. This appeal requires that we determine whether suppliers of lead may be held liable under New Jersey law for the failure to warn employees of an industrial user of lead of dangers associated with lead contamination. We hold that the record reveals genuine issues of material fact relevant to Whitehead's claims on theories of strict liability and negligence. Accordingly, we will reverse the judgment of the district court and remand for further proceedings.
 
 I.
 
 2
 Coriner Whitehead was employed by Alpha Metals, Inc. ("Alpha") between 1950 and April of 1979. Alpha manufactures spooled solder by smelting and processing lead and tin. Whitehead claims to be suffering from lead encephalopathy, a form of lead poisoning, caused by her long-term exposure to lead in Alpha's plant.
 
 
 3
 Depositions on file indicate that Whitehead operated a "spooling machine" 25 to 30 feet from the point at which lead was delivered to the Alpha plant.[1] The machine is similar to a sewing machine, and uses a foot treadle to drive a spool on which solder wire is wound. Corrigan Dep., vol. 1, at 59. Lead arrived in the plant in bundles of 25 to 35 ingots, or "pigs," bound in rows of five, secured with steel strapping and packaged in polyethylene bags. Bailini Dep. at 33. Each bundle bore a lot number and an alloy designation stamped into the metal. Nordstrom Dep. at 19. The bundles were stored in an area adjacent to the "casting department." That department contained twelve "casting pots" used for smelting and casting lead and tin into "billets," or bricks of solder. Corrigan Dep., vol. 1, at 19.
 
 
 4
 A partition or wall separated the casting department from a "spooling" area in which Whitehead worked. The spooling area contained several extrusion presses used to form solder wire from billets, and nine spooling machines. Id. at 11, 16-18. Next to one extrusion press, and some 50 to 75 feet from Whitehead's spooling machine, were two "solder pots" containing molten solder. Bretts Dep. at 62-63. Employees fed wire from the extrusion presses into the spooling area where Whitehead and others wound it onto rolls. Partitions did not separate the extrusion and spooling areas. Id. at 62; Corrigan Dep., vol. 1, at 11.
 
 
 5
 A number of reports and depositions of Whitehead's expert witnesses are in the record. According to this expert testimony, lead particles might have reached the spooling area in several ways. Small amounts of airborne lead originated from vapors rising from molten solder in solder pots in the extrusion area. Bretts Dep. at 63-67. Airborne lead also emerged from the casting department, conveyed either through a doorway joining the casting and spooling areas, or up exhaust stacks and into the spooling area through windows or vents. Id. at 68-69. Metal "fines," or lead particles, were generated by a device used to remove loose debris from solder wire as it wound onto spools. These fines, according to Whitehead's expert, were capable of being blown about by a fan-driven space heater suspended from the ceiling near Whitehead's station, id. at 71-74, and may have been ingested by breathing. Finally although Whitehead wore gloves to protect her hands, acid and solder wire wore holes through her gloves regularly, requiring their replacement twice daily. In her deposition, Whitehead stated that her "hands used to peel a lot, see, the skin come off [my] hands." Whitehead Dep. at 20. Lead may have been absorbed through her hands or ingested inadvertently during meals or at other times.
 
 
 6
 Defendants St. Joe Lead ("St. Joe"), RSR Corp. ("RSR"), and Tonolli Corp. ("Tonolli") are suppliers of lead ingot used by Alpha in the manufacture of solder wire. Neither St. Joe nor Tonolli issued warnings to Alpha or its employees at any time concerning the dangers of working with lead. Welch Dep. at 33; Bailini Dep. at 19, 35. During Whitehead's employment, RSR also did not issue warnings to Alpha or its employees. RSR did, however, begin affixing warnings to shipments of fabricated lead products in November, 1979, and by 1982 had added those warnings to shipments of pig lead as well. Nordstrom Dep. at 21-22. An RSR sales manager indicated that company officials had discussed adding labels to pig lead as early as 1978. Id. at 47-48. RSR's 1982 warnings on shipments of lead ingot were similar to its 1979 warnings on fabricated products. Those warning labels, roughly four inches square in dimension, provided:
 
 
 7
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 8
 RSR Ans. to Interrog., Jan. 19, 1982; Nordstrom Dep. at 23. The company also indicated that industrial users of lead had made inquiries to RSR about those warnings. Id. at 24.
 
 
 9
 In addition to affixing warning labels to shipments of lead ingot, RSR provided pamphlet warnings to its own employees. The 1977 RSR pamphlet explained the causes and symptoms of lead poisoning in lay terms, recommended means of reducing worker exposure to lead contamination, indicated to whom symptoms of lead poisoning should be reported, and asserted that "[y]our employer must provide and you must wear suitable protective clothing such as coveralls, aprons, laboratory coats or work clothes, to prevent lead from getting on your skin." If "ill for any reason," the pamphlet enjoined, "ALWAYS tell your physician that you work with lead and return to work after an illness only upon his approval."[2] The RSR pamphlet was circulated only to employees of RSR, not to employees of firms to which RSR sold lead ingot.
 
 
 10
 Depositions on file gave conflicting indications of the extent to which Whitehead had knowledge during her employment of the dangers of lead contamination. An Alpha employee stated that Alpha "had advised its employees of the danger of working with lead" by 1972. Corrigan Dep., vol. 2, at 52. Other evidence suggested that Whitehead might have inferred that there were dangers associated with her employment. For example, between 1976 and 1979 Alpha administered blood tests to its employees, and periodically required each employee to wear a small air pump, for the purpose of testing for lead contamination. Thompson Dep. at 11-55; Whitehead Dep. at 55. Whitehead herself stated that a fellow employee, Jeannie Harris, had contracted lead poisoning early in the 1970s, and that Whitehead first became aware "that lead could make you sick" at that time. Whitehead Dep. at 60-61, 123.
 
 
 11
 Other evidence, however, suggested that Whitehead had not appreciated the dangers of working with lead. At the time of Jeannie Harris' illness, for example, company officials told Whitehead that Harris did not contract lead poisoning as a result of her work for Alpha. Id. at 69. Although Alpha officials tested for lead, they never informed their employees of these test results. Id. at 56; Corrigan Dep., vol. 1, at 75, 80-81. Similarly, although company officials explained that they were testing for lead, they did not explain "what the consequences might be if the air were found not to be good." Thompson Dep. at 54. The company neither posted warning signs nor held meetings to discuss lead dangers. Whitehead Dep. at 58-59. In addition, although Whitehead saw a number of physicians between 1971 and 1979 for the treatment of loud noises, headaches, blurred vision, and tension--all potential symptoms of lead poisoning--not until 1979 did any physician diagnose her condition as that of lead encephalopathy. Gibbs Dep. at 45. Whitehead's physician stated that he had first informed her of this diagnosis "sometime after June 18, 1979." Id. at 63.
 
 
 12
 Whitehead brought this action on April 3, 1981. The complaint pressed claims under strict liability for failure to warn, see Restatement (Second) of Torts Sec. 402A (1965), and for the negligent failure to warn, id. Sec. 388. Named as defendants were a number of lead suppliers, among them St. Joe, RSR, and Tonolli. Tonolli impleaded Alpha on June 15, 1981. On March 19, 1982, the district court granted summary judgment in favor of Alpha, reasoning that the New Jersey Workers Compensation Act barred any third-party claim for contribution against the employer. See Arcell v. Ashland Chem. Co., 152 N.J.Super. 471, 483-88, 378 A.2d 53, 59-62 (Super.Ct.1977). On February 1, 1983, the district court granted summary judgment in favor of all remaining defendants.
 
 II.
 
 13
 The defendants advance a variety of arguments in support of the district court's grant of summary judgment. There can be no liability under section 402A, they argue, (1) because any exposure to airborne lead was the result of a "substantial alteration" to lead ingot by Alpha, for which the suppliers of lead ingot are not responsible; (2) because Alpha knew of the dangers of airborne lead, thereby relieving lead suppliers of a duty to warn; (3) because Whitehead knew of the dangers of lead at the time defendants shipped lead to Alpha, thereby relieving lead suppliers of a duty to warn; (4) because the dangers of lead poisoning are generally known; and (5) because, as a matter of law, the utility of warning labels on or accompanying lead ingots would be outweighed by their cost. Similar arguments are advanced against the claim of negligent failure to warn under section 388.
 
 
 14
 Moreover, defendants argue, any failure to warn did not proximately cause Whitehead's illness (1) because she knew of the dangers of airborne lead already; (2) because she would not have come into contact with warning labels; and (3) because, in any event, her illness was caused by exposure to lead before defendants supplied lead ingot to Alpha. Finally, Tonolli maintains that the action is time-barred by New Jersey's two-year statute of limitations because the New Jersey tolling provision--which tolls the statute of limitations for actions against foreign corporations not licensed to do business in New Jersey--is unconstitutional.
 
 
 15
 Before considering these arguments, we turn briefly to a review of the still-evolving New Jersey law of strict products liability. We then address whether, on this summary-judgment record, Whitehead has made out a prima facie case under sections 402A and 388. Lastly, we consider the defenses advanced by St. Joe, RSR, and Tonolli.
 
 A. Strict Products Liability
 
 16
 New Jersey has adopted a variation on the so-called Wade-Keeton prudent-manufacturer test for strict products liability. See Wade, On the Nature of Strict Tort Liability for Products, 44 Miss.L.J. 825, 834-38 (1973); Keeton, Product Liability and the Meaning of Defect, 5 St. Mary's L.J. 30, 37-38 (1973). As proposed by Dean John Wade, a product is "not reasonably safe" (or "not duly safe")[3] if a defendant with constructive knowledge of its dangerous condition would be negligent in putting it on the market. The defendant's negligence is to be measured by whether a reasonable person would conclude that the magnitude of the danger as it is proved at the time of trial outweighed the benefits of the product's design or the way in which it was manufactured. Wade, supra, 44 Miss.L.J. at 834; Keeton, supra, 5 St. Mary's L.J. at 38. Wade proposed that seven factors be weighed when assessing a product's risks and benefits:
 
 
 17
 (1) The usefulness and desirability of the product--its utility to the user and to the public as a whole.
 
 
 18
 (2) The safety aspects of the product--the likelihood that it will cause injury, and the probable seriousness of the injury.
 
 
 19
 (3) The availability of a substitute product which would meet the same need and not be as unsafe.
 
 
 20
 (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
 
 
 21
 (5) The user's ability to avoid danger by the exercise of care in the use of the product.
 
 
 22
 (6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.
 
 
 23
 (7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.
 
 
 24
 Wade, supra, 44 Miss.L.J. at 837-38 (footnote omitted).
 
 
 25
 The initial determination of whether a duty to the plaintiff exists rests, in Wade's approach, with the trial court. If the court should determine as a matter of law, in light of the seven factors, that a duty exists to foreseeable plaintiffs, then the court is to submit the case to the jury with instructions pertaining to any of the Wade factors that may have special significance. Id. at 437-40.
 
 
 26
 The New Jersey Supreme Court adopted the Wade-Keeton formulation in Cepeda v. Cumberland Engineering Co., 76 N.J. 152, 153, 386 A.2d 816 (1978). Although the Cepeda court preferred the Restatement formula ("defective condition unreasonably dangerous") to Wade's "not duly safe" or "not reasonably safe," in all other respects the court approved for design defect cases the prudent-manufacturer test advocated by Deans Wade and Keeton. "Subjective" foreseeability of the plaintiff's injury--in the sense that the defendant must actually have foreseen the risk to the plaintiff--therefore need not be established by the plaintiff's case, since scienter is to be imputed to the defendant as a matter of law. "Objective" foreseeability may be relevant, however, and in two ways. First, the absence of objective foreseeability may negate any duty to the plaintiff. Conversely, if a use (or misuse) is objectively foreseeable, a duty to the plaintiff may exist. Thus, Cepeda extended the defendant's duty under strict liability from intended to reasonably foreseeable uses. Second, the absence of objective foreseeability could negate proximate causation. 76 N.J. at 176-78, 386 A.2d at 828.
 
 
 27
 The New Jersey court modified these standards somewhat in Suter v. San Angelo Foundry & Machine Co., 81 N.J. 150, 406 A.2d 140 (1979). Rejecting the definitions of defect offered by Wade and the Restatement, the Suter court required that the jury be charged "in terms of whether the product was reasonably fit, suitable and safe for its intended or foreseeable purposes when inserted by defendant into the stream of commerce ...." Id. at 176, 406 A.2d at 153.[4] Suter also modified the Wade-Keeton prudent-manufacturer test for defect as defined above. The test for defect in New Jersey is now two-fold. If the consumer or user had or would have reasonable expectations concerning a product's design, then the jury need only consider whether the design conformed to those reasonable expectations. When the consumer would have no such expectations--e.g., in the case of a non-self-evident defect--then Suter required that the risk-utility formula adopted in Cepeda be employed. Id. at 170-71, 177, 406 A.2d at 150, 153.[5]
 
 
 28
 In Freund v. Cellofilm Properties, Inc., 87 N.J. 229, 432 A.2d 925 (1981), the New Jersey Supreme Court extended the Suter analysis to failure-to-warn cases. A product may be defective because it is marketed with insufficient or ineffective warnings. Knowledge of the product's danger in the absence of adequate warnings is imputed to the manufacturer. Id. at 240, 432 A.2d at 931. The jury's charge must include, "at a minimum," the "general products liability charge applicable to non-self-evident defects"-- i.e., the Cepeda charge. Thus, the jury must assess whether a manufacturer with constructive knowledge of the dangers of inadequate warnings would market the product without warnings, considering the utility and costs of warnings. The charge, the court held, should focus on "safety" (rather than "fitness" or "suitability"), and must
 
 
 29
 include the notion that the warning be sufficient to adequately protect any and all foreseeable users from hidden dangers presented by the product. This duty must be said to attach without regard to prevailing industry standards.
 
 
 30
 Id. at 243, 432 A.2d at 932.
 
 
 31
 Within this basic framework, we consider whether Whitehead has established a prima facie case of strict liability under New Jersey law.
 
 B. Section 402A
 
 32
 The elements of a prima facie case of strict liability for failure to warn are proof (1) that the product without warnings was defective; (2) that the defect existed when the product was distributed under the control of the defendant; and (3) that the defect proximately caused an injury to a reasonably foreseeable user. Michalko v. Cooke Color & Chem. Corp., 91 N.J. 386, 394, 451 A.2d 179, 183 (1982). The defendants concede that, at all relevant times during which pig lead left their control, warnings neither accompanied the lead nor were otherwise provided to purchasing firms like Alpha or their employees. Thus, we need focus only on the first and third elements above--duty and proximate causation.
 
 1. Duty
 
 33
 The threshold question is whether suppliers of lead have a duty to warn employees of industrial users of lead of the dangers of lead contamination arising from their employment. The question of the existence of a duty vel non is one for the court. Suter, 81 N.J. at 172, 177, 406 A.2d at 151, 153. The burden of going forward with evidence on the risk-utility factors to establish a defect is on the plaintiff. O'Brien v. Muskin Corp., 94 N.J. 169, 185, 463 A.2d 298, 306 (1983). In addressing this question, we must weigh the utility of marketing lead ingot without warnings against the risks to foreseeable users of lead of so marketing it.
 
 
 34
 Constructive knowledge of the dangers to foreseeable users is to be imputed to the defendants. In this case, the record reveals that defendants sold pig lead to Alpha for the purpose of producing solder wire. Evidence proffered by Whitehead also indicated that it was objectively foreseeable that this lead would be smelted, thereby producing airborne lead. The lead and tin "billets" so produced would be extruded and wound, thereby producing metal "fines" and particles which could come into contact with Alpha employees. Thus, we impute knowledge of the dangers to Alpha employees of airborne and particulate lead. We also impute knowledge to the defendants of the risks of failing to warn such persons of these dangers. One such risk includes the consideration that employers like Alpha may not adequately warn.
 
 
 35
 The risks of not warning are obvious. Employers may not themselves warn, or may warn inadequately, thus leaving employees with no warnings at all. In this case, for example, Whitehead proffered evidence that Alpha did not provide adequate warnings to its employees. The absence of such warnings could have a tragic impact on health. Proper warnings, for example, may prompt early diagnosis and treatment, and may afford employees the information necessary to decide whether to continue with their present employment. The record in this case, for example, reveals that no physician diagnosed Whitehead's condition during eight years of treatment. Appropriate warnings may have spurred an early diagnosis, and the treating physician may have recommended a change of employment or early retirement.
 
 
 36
 The costs of warning vary with the type of warning given. Warning labels on pig lead shipments evidently entail minor costs, and are presently employed by RSR.[6] Direct warnings to industrial users in the form of pamphlets or other notices would also evidently be relatively inexpensive; each of the defendants regularly communicates with industrial lead users through its sales agents. Although direct warnings to all employees of industrial users would be more expensive, nothing in the record suggests that such direct individual warnings would be the only adequate means of warning. Suppliers, for example, could provide pamphlets like the RSR pamphlet in the record, see note 2 supra, for distribution by employers to employees. Alternatively, suppliers and employers could conduct joint information sessions. Moreover, suppliers could reduce the cost of notice by acting through their trade associations. Evidence in the record indicates that the Lead Industry Association is such a trade group, and operates an Occupational Health Committee for this purpose. Welch Dep. at 42-44. Moreover, because of the relatively small number of lead suppliers in comparison to the number of lead processors, it may well be that suppliers, acting individually or through their trade associations, are the most efficient cost-avoiders. See Calabresi & Hirschoff, Toward a Test for Strict Liability in Torts, 81 Yale L.J. 1055, 1060-61 (1972); Suter, 81 N.J. at 173, 406 A.2d at 151. Certainly it could be found to be inefficient for many thousands of lead processors individually to duplicate the industrial hygiene research, design, and printing costs of a smaller number of lead suppliers.
 
 
 37
 Summarizing, there is evidence of a significant risk that employers may not adequately warn their employees of the danger of lead contamination. Knowledge of that risk is imputed to defendants. The potential harms of failing to warn, even discounted by the possibility that some employers may warn adequately, are considerable. Because the utility of lead ingot would not be impaired by warnings, because no evidence in the record suggests that costs of warning are substantial--and some evidence indicates that warnings are feasible and relatively inexpensive--because the risks of not warning may be significant, and because suppliers of pig lead may be the most efficient cost-avoiders, we cannot say, as a matter of law, that the cost of warnings outweighs their utility. Consequently, the summary judgment cannot be affirmed on the ground that Whitehead did not come forward with evidence of a duty to warn. The jury must be given an opportunity to decide whether lead suppliers with constructive knowledge of these costs and benefits would act negligently in failing to warn Alpha or its employees of the dangers of lead contamination.
 
 
 38
 This statement of the law is confirmed in two recent decisions of the New Jersey Supreme Court. In Freund v. Cellofilm Properties, Inc., supra, the court held that in "the case of a design defect consisting of an inadequate warning, ... imposing the requirements of a proper warning will seldom detract from the utility of the product." 87 N.J. at 238 n. 1, 432 A.2d at 930 n. 1. Consequently, the court reasoned, in such cases the "utility of the product, as counterbalanced against the risks of its use, is rarely at issue." Id. at 242, 432 A.2d at 932. The court reiterated this observation in Beshada v. Johns-Manville Products Corp., 90 N.J. 191, 447 A.2d 539 (1982). There the court required that the jury consider whether "the risk from the product [has been] reduced to the greatest extent possible without hindering its utility." Id. at 201, 447 A.2d at 545. In warning cases, the court held, the risk can generally be reduced by means of a warning without hindering the product's utility. Id. These cases indicate that if the plaintiff comes forward with evidence that warnings against a non-obvious danger would reduce a product's risk significantly without hindering its utility, a verdict should not be directed for defendant on the ground of absence of a duty to warn as a matter of law. In light of these authorities, we are confident that the New Jersey Supreme Court would not hold that the cost of warnings to these suppliers outweighs their utility as a matter of law.
 
 2. Proximate causation
 
 39
 We have already held that Whitehead tendered evidence suggesting that it was foreseeable that airborne lead and lead particulate would come into contact with her. Moreover, it is conceded for summary judgment purposes that this lead contact was in fact the cause of her illness. There is also evidence suggesting that warnings either to Alpha or to its employees may have reduced the risk of illness due to lead contamination. Thus, it would appear that the summary judgment could not be affirmed on the ground of absence of proximate causation.
 
 
 40
 Defendants nevertheless argue that as suppliers of lead they are too remote from any injury to Alpha employees to be charged with proximate causation. That argument is foreclosed, however, by the New Jersey Supreme Court's decision in Michalko v. Cooke Color & Chemical Corp., 91 N.J. 386, 451 A.2d 179 (1982). The defendant in Michalko was an independent contractor who supplied a machine to Michalko's employer without safety devices or warnings. The defendant argued that as an independent contractor, its failure to warn was not the proximate cause of any injury to the employee. In addressing this argument, the court stated:
 
 
 41
 Defendant argues that even if it had given a warning, there was no proof that [the employer] would have installed a safety device. Implicated in that argument, however, is the issue of proximate cause. The question whether the failure to warn proximately caused a plaintiff's injury is a factual dispute that the jury should decide. A reasonable jury could find that the inclusion of a warning by [the contractor] would have increased the chances that [the employer] would have added a safety device or taken other measures, such as affixing suitable warnings or giving specific cautionary instructions for the benefit of the operators of the machine to reduce the risk of danger.
 
 
 42
 Moreover, a proper warning could have been directed to the foreseeable users of the dangerous machine. Such a warning by defendant could have put [the] employees on notice of the inherent dangers in using the machine without a safety device. This might have reduced the risk of injury. Thus, we have held that in some circumstances a manufacturer may have a duty to attach a suitable warning to the machine itself to caution the operator about the danger of using it without a protective device.
 
 
 43
 Id. at 402-03, 451 A.2d at 187.
 
 
 44
 We see no significant difference between the independent contractor in Michalko and the suppliers in this case. A reasonable jury could find that the inclusion of a warning by lead suppliers would have increased the chances that Alpha would have improved plant hygiene, or taken other measures, "such as affixing suitable warnings or giving specific cautionary instructions for the benefit of [employees] to reduce the risk of danger." Similarly, a proper warning might have been directed to the foreseeable employees directly. Whether such measures would have had their intended effect is a question of fact for the jury. Thus, we cannot affirm the summary judgment on the ground that lead suppliers are too remote to be charged with proximate causation.
 
 C. Section 388
 
 45
 Unlike Restatement (Second) section 402A, section 388 imposes liability on suppliers for the negligent failure to warn foreseeable users of a product's dangerous condition.[7] The New Jersey Supreme Court has addressed the distinction between the failure to warn under section 388 and section 402A. The only meaningful distinction between those sections, the court has held, is that under section 388, knowledge of a product's dangerous propensities without a warning is not imputed to the manufacturer. Freund v. Cellofilm Properties, Inc., 87 N.J. at 239-40, 432 A.2d at 930-31.
 
 
 46
 In this case, defendants concede that they had actual knowledge of the dangerous propensities of exposure to airborne lead and metal fines. Thus, this knowledge need not be imputed to them. It is not equally clear, however, that the defendants also had actual knowledge of the risks that Alpha would inadequately warn employees of this danger. Such knowledge was imputed under section 402A. Under section 388, in contrast, Whitehead would be obliged to prove that the defendants knew or had reason to know of that risk. Thus, we may affirm the summary judgment on the section 388 claim only if the record reveals no material issue of disputed fact over whether defendants knew or had reason to know of the risks of Alpha's failure to warn.
 
 
 47
 Because this question is intimately tied to the defense that defendants had no duty to warn the employees of a knowledgeable employer, we address it below. See Part III C 2 infra.
 
 III.
 
 48
 We now consider the defenses raised by St. Joe, RSR and Tonolli.
 
 A. Substantial Change
 
 49
 Defendants argue that a supplier is not liable for the failure to warn of dangers caused by substantial changes in a product. Lead arrived in Alpha's plant, they argue, in ingot form, not in the form of airborne particles or metal fines. Thus, they conclude, any airborne lead or metal fines to which Whitehead may have been exposed were the result of a "substantial change" to the lead ingot they supplied.
 
 
 50
 Section 402A(1)(b) of the Restatement (Second) of Torts provides that the seller of a defective product can be held liable if the product "is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." Consequently, the general rule is that the manufacturer of a product may be held strictly liable for injuries caused by the product only if it did not undergo substantial change after leaving the manufacturer's hands. See Michalko, 91 N.J. at 399, 451 A.2d at 185; States Steamship Co. v. Stone Manganese Marine, Ltd, 371 F.Supp. 500, 505 (D.N.J.1973).
 
 
 51
 However, the general rule is limited to changes for which it is not foreseeable that the alteration will cause injury. Thus, the rule has been stated as follows:
 
 
 52
 To constitute a defect it is not necessary that the ultimate "defect" as it appeared and developed shortly prior to the accidental occurrence existed in that form at the time possession was surrendered.... The rule is that if the manufacturer or assembler surrenders possession and control of a product in which change will occur, or in which the change can be anticipated to occur so as to cause a product failure, the existence of a defect at the vital time is established.
 
 
 53
 Sharp v. Chrysler Corp., 432 S.W.2d 131, 136 (Tex.Civ.App.1968). New Jersey follows the general rule. In Cepeda v. Cumberland Engineering Co., 76 N.J. 152, 386 A.2d 816 (1978), for example, an employer modified a safety device on a machine, thereby causing injury to the operator. The machine's design nevertheless made the employer's change a foreseeable one. Consequently, the court held, the designer could be held liable for injuries proximately caused by the design alteration. Id. at 180-81, 386 A.2d at 830.
 
 
 54
 In this case it was objectively foreseeable that lead particles would be generated by Alpha's use of lead ingot. The fact that defendants supplied lead in ingot form, rather than in the form of airborne particles or metal fines, is of no consequence. The law of torts does not turn on such nice distinctions of physical chemistry. See States Steamship Co. v. Stone Manganese Marine, Ltd, 371 F.Supp. at 505 (change of shape not a "substantial change"). The relevant question is whether the production of airborne and particulate lead was a foreseeable consequence of Alpha's operations. We have held that there is record evidence that it was. Thus we cannot affirm the summary judgment on the ground that lead supplied by defendants underwent a "substantial change."
 
 B. Whitehead's Knowledge
 
 55
 Defendants argue, and the district court held, that lead suppliers had no duty to warn Whitehead of dangers attending the use of lead because she already had knowledge of those dangers.[8] We cannot affirm the summary judgment on this ground for several reasons.
 
 1. Material issues of disputed fact
 
 56
 First, the extent of Whitehead's knowledge is a material issue of disputed fact. We are not concerned here with whether Whitehead had general notions that lead could be dangerous. Many products consumed in adequate doses over a sufficient length of time could be dangerous. Thus, it is irrelevant that, as defendants contend, Whitehead may have known that ingesting lead paint chips could be harmful. Rather, the question is whether Whitehead had particular knowledge that lead levels in Alpha's plant were high enough, and her exposure to them was long enough, to impair her health.
 
 
 57
 On this summary judgment record, "all 'inferences to be drawn from the underlying facts contained in [the movant's] materials must be viewed in the light most favorable to the party opposing the motion.' " Coastal States Gas Corp. v. Department of Energy, 644 F.2d 969, 979 (3d Cir.1981). If there is "any evidence in the record from any source from which a reasonable inference in the respondent's favor may be drawn, the moving party simply cannot obtain a summary judgment, no matter how many affidavits are filed." In re Japanese Elec. Prods. Litig., 723 F.2d 319 (3d Cir.1983).
 
 
 58
 In this case, there is ample evidence from which the trier of fact might infer that Whitehead did not know that lead levels were high enough, and her exposure to them long enough, to cause her harm. For example, Alpha tested for each employee's exposure to lead, but did not inform its employees of the test results. A trier of fact might reasonably infer that Alpha did not regard the lead levels detected as posing a health hazard to employees. A jury might also infer that Whitehead and other employees acted reasonably in relying on such an inference. Similarly, Whitehead avers that Alpha posted no warning signs, held no meetings, and did not explain to its employees what the consequences would be if the air in its plant "were found not to be good." A jury might infer from those facts that Alpha employees could reasonably believe that lead levels posed no health hazard. Moreover, Whitehead evidently did not inform her physicians of possible health hazards caused by lead exposure until 1979. A jury might infer that she did not believe that high lead levels caused the symptoms about which she complained. These material issues of disputed fact prevent the entry of summary judgment on the basis of Whitehead's knowledge for purposes of sections 402A and 388.
 
 2. Assumption of risk
 
 59
 Second, on the section 402A claim, Whitehead's knowledge of any danger would in this case raise only a question of assumption of risk (or proximate causation, see Part III E infra), not duty.[9] We could not affirm the section 402A claim on the basis of assumption of risk, however, for two reasons. First, assumption of risk is a defense to section 402A only when the plaintiff "voluntarily and unreasonably proceed[s] to encounter a known danger." Restatement (Second) of Torts Sec. 402A comment n. Thus, assumption of risk has three elements: the plaintiff's conduct must be (1) knowing, (2) voluntary, and (3) unreasonable. See Twerski, Old Wine in a New Flask--Restructuring Assumption of Risk in the Products Liability Era, 60 Iowa L.Rev. 1, 25-34 (1974). Any proof that Whitehead knew of the risk would only pertain to the element of knowledge. The record would also have to reveal that Whitehead's conduct in exposing herself to lead in the course of her employment was unreasonable.
 
 
 60
 The New Jersey Supreme Court addressed the reasonableness requirement of assumption of risk in Cepeda. There the court held that:
 
 
 61
 action may be found to be reasonable if taken by a workman under the reasonable understanding that such action is expected of him or acceptable in the performance of his work, although involving the encountering of a known hazard.
 
 
 62
 Cepeda, 76 N.J. at 191, 386 A.2d at 835, citing with approval Twerski, supra, 60 Iowa L.Rev. at 27. Although the Cepeda court addressed the reasonableness of continuing to operate a factory machine in the face of a known risk, the court's reasoning is equally applicable to the reasonableness of continuing employment in spite of a known risk. Whether Whitehead acted reasonably in the continuation of her employment because she had the "reasonable understanding that such action [was] expected of [her] or acceptable in the performance of [her] work, although involving the encountering of a known hazard," is plainly a material issue of disputed fact. Thus, we could not affirm the summary judgment on this ground.
 
 
 63
 Second, the New Jersey Supreme Court has held that in design defect cases, assumption of risk is not a defense
 
 
 64
 when plaintiff, an employee in an industrial setting, using [a] machine in an intended or reasonably foreseeable manner, is injured because of that defect, and in the absence of that defect the injury would not have occurred.
 
 
 65
 Suter, 81 N.J. at 177, 406 A.2d at 153. This so-called Bexiga rule, see Bexiga v. Havir Manufacturing Co., 60 N.J. 402, 412, 290 A.2d 281, 286 (1972), is predicated on the policy justification that "an employee engaged at his assigned task on a plant machine, as in Bexiga, has no meaningful choice." Suter, 81 N.J. at 167, 406 A.2d at 148. A footnote in Suter provided, however, that "[w]e are not herein passing upon other situations wherein an employee may similarly be held to have had no meaningful choice." Id. at n. 5.
 
 
 66
 Whitehead may well be within the ambit of the Bexiga rule. She was an industrial employee using a product in a foreseeable manner. It is alleged that observance of the duty to warn would have prevented some portion of her injuries. Like Bexiga, she had no meaningful control over her work environment. Because the district court has not addressed the applicability of the Bexiga rule, we decline to dispose of the question in the first instance here. If on remand, however, the district court concludes that Whitehead is protected by the Bexiga rule, then any knowledge on her part, and the reasonableness of her continuing employment, would be irrelevant to the section 402A claim.[10]
 
 C. Alpha's knowledge
 
 67
 Defendants argue that Whitehead's employer, Alpha, knew of the dangers of failing to warn its employees of risks caused by their exposure to lead. Further, they argue, a supplier of raw materials has no duty to warn the employees of a knowledgeable vendee of the dangers associated with their employment. Therefore, defendants conclude, Alpha's knowledge obviated any duty to warn by suppliers of lead ingot.
 
 1. Section 402A
 
 68
 In strict liability cases, New Jersey does not apply the rule that sellers need not, as a matter of law, inform the employees of a knowledgeable buyer of the dangerous condition of a product. In Michalko, defendants argued that "an independent contractor has no duty to warn a knowledgeable buyer that a machine is dangerously designed." 91 N.J. at 393, 451 A.2d at 182. That argument the court rejected, holding instead that the probable effect of any warning to a knowledgeable buyer simply presents a question of fact concerning proximate causation for the jury. Id. at 402, 451 A.2d at 187.
 
 
 69
 That rule is consistent with the New Jersey court's treatment of defects in product design. In Bexiga, for example, the defendant manufacturer had argued that it was absolved of liability for a design defect when it may have expected the purchaser to provide safety devices. The court held:
 
 
 70
 Where a manufacturer places into the channels of trade a finished product which can be put to use and which should be provided with safety devices because without such it creates an unreasonable risk of harm, and where such safety devices can feasibly be installed by the manufacturer, the fact that he expects that someone else will install such devices should not immunize him.
 
 
 71
 60 N.J. at 410, 290 A.2d at 285 (emphasis added). Under New Jersey law, such joint causes simply present a question of concurrent causation. Michalko, 91 N.J. at 400, 451 A.2d at 186; Freund, 87 N.J. at 245-48, 432 A.2d at 933-34. Thus, any breach of a duty by Alpha to its employees "would not constitute a defense as a matter of law to plaintiff's strict liability claim against" lead suppliers. Michalko, 91 N.J. at 400-01, 451 A.2d at 186.
 
 
 72
 There is no basis for assuming that New Jersey would treat design defect and failure to warn differently in this respect. The fact that defendants may have expected that Alpha would issue warnings would not immunize them as a matter of law. Defendants would have us impute to them, as a matter of law, constructive knowledge that Alpha would in fact warn its own employees. That would be flatly inconsistent with the section 402A requirement that we impute to defendants constructive knowledge of the risks of failing to warn, one of which is that Alpha itself may not warn. Moreover, it would plainly be inconsistent with New Jersey's treatment of design defects under section 402A. Thus, we cannot affirm the summary judgment on strict liability on the ground of Alpha's knowledge.
 
 2. Section 388
 
 73
 Many jurisdictions construing section 388 hold, as a matter of law, that a supplier has no duty to warn a knowledgeable vendee of the dangerous condition of a product. Marker v. Universal Oil Products Co., 250 F.2d 603, 606 (10th Cir.1957) (Oklahoma law); Lockett v. General Electric Co., 376 F.Supp. 1201, 1208-09 (E.D.Pa.1974) (Pennsylvania law); Littlehale v. E.I. duPont de Nemours & Co., 268 F.Supp. 791, 798-99 (S.D.N.Y.1966) (admiralty law, relying on section 388). These courts appear to hold that a chattel supplier may reasonably presume, as a matter of law, that a knowledgeable vendee will give warnings to its employees. Because knowledge of the risk that the vendee may not warn is imputed under section 402A, such cases have no applicability to strict liability for failure to warn. Under section 388, the plaintiff must show that defendant negligently ignored or failed to discover that risk. We must decide whether New Jersey also holds, as a matter of law, that no duty to warn under section 388 arises for the supplier of a knowledgeable vendee. If New Jersey does not bar relief as a matter of law, we must decide whether a genuine issue of material fact is in dispute concerning whether defendants were negligent in presuming that Alpha would warn. We are cited to no New Jersey cases directly on point.
 
 
 74
 Although the New Jersey courts have not expressly addressed the issue, the New Jersey Supreme Court has held that the only material distinction between negligence and strict liability for the failure to warn is that under section 402A, constructive knowledge of the risk is imputed to the defendants. Under section 388, in contrast, such knowledge is not imputed, and the plaintiff must prove that defendants were negligent in failing to discover the risk involved. Freund, 87 N.J. at 239-41, 432 A.2d at 930-31. Thus, Whitehead must prove that the defendants were negligent in relying on Alpha to warn her. It does not appear that the New Jersey Supreme Court would bar such proof as a matter of law. Rather, like the case under strict liability, the extent of an employer's knowledge would simply create a question of fact concerning proximate causation for the jury. Cf. Michalko, 91 N.J. at 402-03, 451 A.2d at 187. Thus, we must decide whether such a material issue of disputed fact exists on this record.
 
 
 75
 The record reveals no direct evidence that the defendants actually knew that Alpha provided no warnings to its employees. However, Whitehead presented some evidence that defendants may or should have known that fact. The deposition of a St. Joe official, for example, indicated that he and an Alpha employee, Robert Corrigan, together served on the Occupational Health Committee of the Lead Industry Association. Welch Dep. at 42, 44. That committee operated to inform members of the Lead Industry Association of methods for controlling health problems arising from the industrial use of lead. A trier of fact might infer that St. Joe was or should have been apprised of Alpha's practices through the Occupational Health Committee. Similarly, a jury might infer that RSR and Tonolli were (or should have been) apprised, through the auspices of the Lead Industry Association, of whether its purchasers issued proper warnings to employees. We are not prepared, therefore, to say on this record that there is no material issue of disputed fact as to whether defendants were negligent in relying on Alpha to warn.
 
 D. Dangers Generally Known
 
 76
 Comment j to section 402A of the Restatement (Second) of Torts provides that a seller has no duty to warn "when the danger, or potentiality of danger, is generally known and recognized." As illustrations of generally known risks, the Restatement refers to the "dangers of alcoholic beverages" and "of foods containing such substances as saturated fats." New Jersey applies the "generally known" danger rule. See Height v. Kawasaki Heavy Industries, Ltd, 190 N.J.Super. 7, 10, 461 A.2d 757, 758 (App.Div.1983); Torsiello v. Whitehall Laboratories, 165 N.J.Super. 311, 320, 398 A.2d 132, 136 (App.Div.1979). Defendants argue that lead contamination is such a generally known danger, and therefore that there is no duty to warn against it.
 
 
 77
 We cannot conclude that lead exposure in the workplace is a "generally known" risk requiring no warning as a matter of law. Our concern is not with whether it is generally known that lead can be harmful if deliberately consumed. Rather, we consider whether safe exposure limits to airborne lead are generally known, and whether it is generally known that these levels were exceeded in plants like Alpha's. Nothing in the record suggests that either factor was "generally known" during Whitehead's employment. Indeed, there has been continuing scientific dispute over safe exposure levels to airborne lead and the extent to which employees are jeopardized by that exposure.[11] In short, we do not equate airborne lead particles with fatty foods or alcoholic beverages, which, after all, are intended for ingestion. Therefore, we cannot affirm the summary judgment on the ground that exposure to lead is a "generally known" risk.
 
 E. Proximate Cause
 
 78
 Defendants maintain that the record permits no inference that their failure to warn was a proximate cause of Whitehead's illness (1) because she already had personal knowledge of the risk; (2) because she would not have seen any warning labels on shipments of pig lead; and (3) because her exposure to lead was occasioned, in part, at times during which the defendants were not suppliers of lead to Alpha.
 
 
 79
 We can affirm the summary judgment on none of these grounds. Our conclusion that the extent of Whitehead's knowledge is a disputed issue of material fact disposes of the first contention. We have also noted that defendants might have warned Alpha employees in any number of ways; thus, whether Whitehead would have seen a warning label on shipments of pig lead is not dispositive. Moreover, the question whether Whitehead would have seen such labels is clearly a disputed issue of fact for the jury. Finally, any injuries occasioned by lead supplied by other firms would simply raise an issue of concurrent causation. Freund, 87 N.J. at 245-48, 432 A.2d at 933-34. Thus, the question of proximate cause must be resolved by the jury.
 
 F. Statute of Limitations
 
 80
 Actions at law in New Jersey for injury to the person must be commenced within two years after the cause of action accrued. N.J.Stat.Ann. Sec. 2A:14-2 (West 1952). However, the statute of limitations for actions against non-resident defendants is tolled during the period of the defendant's non-residence. N.J.Stat.Ann. Sec. 2A:14-22 (West 1952). The defendants in this action are foreign corporations not licensed to do business in New Jersey, and are therefore subject to the tolling statute. Tonolli argues that the tolling provision of section 2A:14-22 violates the commerce clause of the United States Constitution.[12] Therefore, the company argues, the two-year period of section 2A:14-2 applies. Further, Tonolli maintains that Whitehead's cause of action accrued more than two years before April 3, 1981, the date on which she filed this action. Therefore, the company concludes, the action is time-barred.
 
 
 81
 Under New Jersey law, a cause of action accrues when the plaintiff first knows or has reason to know of its existence. Gleason v. United States, 458 F.2d 171, 174 (3d Cir.1972). The deposition of Whitehead's physician reports that he first informed her of the diagnosis of lead encephalopathy "sometime after June 18, 1979." Gibbs Dep. at 45. A reasonable jury might infer that Whitehead did not and should not have known of the cause of action until that date. If the jury so finds, the action would be within the two-year limit of section 2A:14-2. Thus, we need not address the constitutionality of the tolling provision of section 2A:14-22.
 
 IV.
 
 82
 Because Whitehead has established a prima facie case of liability under sections 402A and 388, and because none of the defenses advanced provides a ground for affirmance on this summary-judgment record, the judgment of the district court will be reversed and remanded for proceedings in conformance with this opinion.
 
 
 
 *
 Hon. Edward Dumbauld, United States District Judge for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 Whitehead Dep. at 44. Although counsel did not file Whitehead's deposition with the clerk of the district court, that deposition was before the court and was relied upon in the court's opinion. We will therefore treat the Whitehead deposition as part of the summary-judgment record
 
 
 [2]
 Id. The RSR pamphlet provided in part:
 How Lead May Affect You
 Most cases of industrial lead poisoning occur through inhalation, that is, breathing. Lead dust is introduced into the atmosphere through the grinding and cutting processes of fabrication, or lead fumes can come from heating lead to its molten state as with melting, smelting, soldering or welding processes. Welding steel which is coated with lead paint can produce lead fume. By breathing the dusts or fumes, workers may develop lead poisoning. On a lesser scale, lead poisoning may occur from eating contaminated foods, smoking contaminated tobacco or the careless handling of objects that have been contaminated with toxic lead compounds such as leaded paint in the home....
 In industry, lead poisoning is more frequently chronic, or prolonged, than acute. Traces of lead accumulate in the body over a period of time. Chronic lead poisoning is slow and vague in its beginnings, and the signs and symptoms are not well defined. No one symptom indicates the occurrence of lead poisoning. At first, one may experience a general ill-feeling, fatigue, exhaustion, irritability, loss of appetite and weight, vague abdominal discomfort and a yellow discoloration of the skin. Later there is more often colic and constipation and a disturbance of sleep.
 How Lead Exposure Can Be Controlled
 Effective control to prevent harmful exposure to lead contamination requires an awareness of the potential health hazards and the institution and continuing utilization of effective protective measures. The latter include engineering, processing, environmental, medical and hygienic protective measures.
 For continued exposure protection, an adequate ventilation and exhaust system is a fundamental engineering control. Work areas with high concentrations of lead dust and fumes should be isolated from other areas and the dust and fumes collected at the point of origin by means of a local exhaust ventilation system. The contaminants should be vented in a manner so as not to contribute to pollution of the outside air.
 A necessary part of any lead control program is the physical examination. This should be given before the worker is assigned to areas where there is potential exposure to lead. The examination includes blood tests. A history of lead exposure and other medical information is maintained for each worker to insure individual protection.
 What Effects From Lead Should Be Reported
 Any evidence of disturbance of the digestive system, muscle pain and stiffness in joints, general weakness, weight loss and paleness, should be brought immediately to the attention of the supervisor, nurse, or doctor, depending on plant procedures....
 
 
 [3]
 Compare Wade, On Product "Design Defects" and Their Actionability, 33 Vand.L.Rev. 551, 571 (1980) with Wade, supra, 44 Miss.L.J. at 833. Dean Wade offered both formulations as an alternative to the Restatement (Second) formula, "defective condition unreasonably dangerous." Restatement (Second) of Torts Sec. 402A(1) (1965)
 
 
 [4]
 The court reasoned that the Restatement definition--"defective condition unreasonably dangerous"--suggested the imposition of a larger burden on the plaintiff than is actually appropriate. Id. at 174-75, 406 A.2d at 152. In so holding, the court adopted the reasoning of the California Supreme Court in Cronin v. J.B.E. Olson Corp., 8 Cal.3d 121, 501 P.2d 1153, 104 Cal.Rptr. 433 (1972)
 
 
 [5]
 Suter is therefore a close cousin (if not a sibling) of the California Supreme Court's decision in Barker v. Lull Eng. Co., 20 Cal.3d 413, 573 P.2d 443, 143 Cal.Rptr. 225 (1978). The two-prong test of Barker provides that:
 in design defect cases, a court may properly instruct a jury that a product is defective in design if (1) the plaintiff proves that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) the plaintiff proves that the product's design proximately caused injury and the defendant fails to prove, in light of the relevant factors, that on balance the benefits of the challenged design outweigh the risk of danger inherent in such design.
 Id. at 426-27, 573 P.2d at 452, 143 Cal.Rptr. at 234 (emphasis omitted). Unlike Barker, under Suter the "consumer expectation" and "prudent manufacturer" charges are employed in the conjunctive, not the disjunctive, and the burden of persuasion in Suter is not shifted to the defendant to show that benefits outweigh risk. See Birnbaum, Unmasking the Test for Design Defect: From Negligence [to Warranty] to Strict Liability to Negligence, 33 Vand.L.Rev. 593, 624-25 (1980).
 
 
 [6]
 Fed.R.Evid. 407 prohibits the use of subsequent remedial measures to prove "negligence or culpable conduct." The rule does not, however, require the exclusion of such evidence when offered to prove, inter alia, "feasibility of precautionary measures, if controverted." Thus, we may consider the RSR warning labels as evidence of the feasibility and cost of warning under the Sec. 402A risk-utility analysis. A jury could infer that such warnings are feasible and not cost-prohibitive
 
 
 [7]
 Section 388 provides:
 Sec. 388. Chattel Known to be Dangerous for Intended Use
 One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
 (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
 (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
 (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.
 Restatement (Second) of Torts Sec. 388 (1965). Comment a to that section continues:
 a. The words "those whom the supplier should expect to use the chattel" and the words "a person for whose use it is supplied" include not only the person to whom the chattel is turned over by the supplier, but also all those who are members of a class whom the supplier should expect to use it or occupy it....
 
 
 [8]
 A recent decision of the New Jersey Appellate Division addresses, somewhat inconclusively, the question whether a manufacturer has a duty to warn a knowledgeable user of a product's dangerous condition. Campos v. Firestone Tire & Rubber Co., 192 N.J.Super. 251, 469 A.2d 943 (App.Div.1983). In that case the Appellate Division ordered a directed verdict for the defendant, holding that no duty to the plaintiff arose when (1) the plaintiff had knowledge of the specific risk; (2) the risk was "well known"; (3) warnings of some kind had been given; (4) further warnings would have been inefficacious--in that case because the plaintiff was illiterate; (5) safety equipment was in use; and (6) the "hazard was avoidable by exercise of common sense." Id., 469 A.2d at 949. An incisive dissent argued that the majority confused the question of "duty" with that of "proximate causation."
 We agree with the dissent that in strict liability under New Jersey law, a plaintiff's particular knowledge appears to relate to proximate causation and assumption of risk, not to duty. Duty is derived by imputing knowledge of risk and utility to a class of users, and weighing the resulting costs and benefits. Particular knowledge, on the other hand, affects proximate causation and assumption of risk in individual cases. To reason otherwise leads to the conclusion, widely criticized by commentators, that a manufacturer's duty rises and falls with respect to the particular characteristics of every potential plaintiff--a conclusion the Wade-Keeton test was expressly designed to avoid. See Birnbaum, supra note 5, 33 Vand.L.Rev. at 611-12; Twerski, Old Wine in a New Flask--Restructuring Assumption of Risk in the Products Liability Era, 60 Iowa L.Rev. 1, 35-36 (1974).
 Obviousness of danger, however, directly relates to duty, since it bears on the risk-utility analysis concerning a class of potential plaintiffs. See Part III D infra. Thus, Campos is best understood as an obviousness-of-danger case insofar as it held that no duty arose. Because we hold infra that summary judgment cannot be entered on the basis of Whitehead's knowledge, and that the risk to her was not "obvious," Campos is not dispositive of this case.
 
 
 [9]
 Cf. Campos v. Firestone Tire & Rubber Co., 192 N.J.Super. 251, 469 A.2d 943 (App.Div.1983) (knowledge may vitiate duty if danger is "obvious" and warnings would not be efficacious); note 8 supra
 
 
 [10]
 In Campos, the majority found no need to reach the question whether the Bexiga rule applied to strict liability for failure to warn under the facts presented. The dissent, reaching the question, would have applied Bexiga. 469 A.2d at 954-955 (Dreier, J., dissenting)
 
 
 [11]
 Although studies recognized certain dangers of lead contamination in the early part of this century, see 40 Fed.Reg. 45934, 45934 (1975), the federal government did not undertake to regulate exposure to lead in the workplace until 1971. At that time the Occupational Safety and Health Administration (OSHA) established a maximum exposure limit to airborne lead of 200 micrograms per cubic meter of air (ug/m[3] ). See 36 Fed.Reg. 15101, 15104 (1971). Intensive debate about acceptable lead exposure levels immediately prompted proposals to increase the stringency of this standard. In 1973, the Director of the National Institute for Occupational Safety and Health advised the Secretary of Labor to lower the lead standard to 150 ug/m[3], and in 1975 urged the Secretary to lower the standard further still. See United Steelworkers of America v. Marshall, 647 F.2d 1189, 1204 (D.C.Cir.), cert. denied, 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981); 40 Fed.Reg. 45934, 45934 (1975). OSHA proposed to reduce the standard to 100 ug/m[3] in 1975. As promulgated, however, the final OSHA standard issued in 1978 authorized exposure to no more than 50 ug/m[3] of airborne lead averaged over an eight-hour period. See 43 Fed.Reg. 52952-53014 (1978), as amended, 44 Fed.Reg. 5446-48 (1979); 29 C.F.R. Secs. 1910.19(g), 1910.1025(c)(1) (1983). Union and industry representatives promptly attacked this standard as both too lenient and too stringent, a dispute ultimately resolved in favor of OSHA in 1980. See Marshall, 647 F.2d at 1252-63 (lead exposure limit supported by substantial evidence).
 
 
 [12]
 In G.D. Searle & Co. v. Cohn, 455 U.S. 404, 102 S.Ct. 1137, 71 L.Ed.2d 250 (1982), the Supreme Court sustained the constitutionality of section 2A:14-22 on equal protection grounds and remanded for a determination of its constitutionality under the commerce clause. Id. at 412-14, 102 S.Ct. at 1143-1144, 1145. The New Jersey Supreme Court recently struck down section 2A:14-22 on commerce clause grounds in Coons v. American Honda Motor Co., 94 N.J. 307, 316-19, 463 A.2d 921, 926-27 (1983)