Laverne HAASE, Plaintiff-Appellant,†

Larry BRAATZ, Norb Braun, Fidel Castillo, Gregory Ebel, Lawrence Ferge, Leon Fuerst, Carol Guyette, Estate of Ray Guyette, David Hamilton, Floyd Hanson, Jerald Heuer, Daniel Janiak, Rick Knudsen, Wesley Kupsky, Sr., James Mohrman, James Maroney, Terry Olejnik, Robert Parry, Donald Quaintance, Delores Radtke, Estate of Marvin Radtke, Candelario Rodriguez, Dale Sittman, Alois Steger, John Stilp, William Surprise, Jacob Vertz, Richard Weber and Arthur Zinkel, Plaintiffs,

v.

BADGER MINING CORPORATION, Defendant-Respondent,

MINE SAFETY APPLIANCES COMPANY, Minnesota Mining & Manufacturing, North Safety Products Company, The Norton Company, Textron Inc., Liberty Mutual Insurance Company, Travelers Casualty and Surety, American Optical Corporation, Dalloz Safety Inc. and Employers Insurance Company of Wausau, Defendants.

Court of Appeals

*No. 02–1681. Oral argument May 7, 2003.—Decided August 6, 2003.*

† Petition to review granted 1-23-04.

2003 WI App 192

(Also reported in 669 N.W.2d 737.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Louis L. Plotkin* and *Rodney P. Vincent* of *Gertler, Gertler, Vincent & Plotkin, LLP* of New Orleans and *Ronald L. Lampe* and *Brian Hamill* of *Dempsey, Williamson, Lampe, Young, Kelly & Hertel, LLP* of Oshkosh. There was oral argument by *Louis L. Plotkin* and *Ronald L. Lampe.*

On behalf of the defendant-respondent Badger Mining Corporation, the cause was submitted on the brief of *L. John Argento* and *Cathy R. Gordon* of *Dickie, McCamey & Chilcote, P.C.* of Pennsylvania and *Michael J. Cohen* and *Steven F. Stanaszak* of *Meissner, Tierney, Fisher & Nichols, S.C.* of Milwaukee. There was oral argument by *Cathy R. Gordon*.

Before Brown, Nettesheim and Snyder, JJ.

¶ 1. BROWN, J. The factual predicate of this case mirrors that of *Bergfeld v. Unimin Corp.*, 319 F.3d 350 (8th Cir. 2003). There, a foundry worker who had developed silicosis brought a products liability action against the supplier of silica sand that sold sand to the foundry, alleging that the supplier failed to provide the foundry and the worker with adequate information about the risks of silicosis due to exposure to silica dust. *Id.* at 353–54. The Eighth Circuit Court of Appeals held that the silica sand supplier had no duty to warn the foundry of the sand's dangerous propensities where the foundry was a sophisticated user of the sand and it should have been aware of its dangerous characteristics. *Id.* at 352. Here, Laverne Haase contends that Badger Mining Corporation, a supplier of silica sand, had a duty to provide Neenah Foundry, his employer, with instructions on how to safely use the silica sand. He argues that *Bergfeld* and its discussion of the sophisticated user defense are inconsistent with Wisconsin law and do not apply to this case. We hold that the sophisticated user defense is available in Wisconsin. We adopt and apply the rationale of *Bergfeld* to this case and affirm the trial court's dismissal of Haase's negligence claim on that basis.

974

¶ 2. Haase also argues that the trial court erred in applying RESTATEMENT (THIRD) OF TORTS § 5 (1998) and in dismissing his strict liability claim. We conclude that the trial court properly applied § 5 to Haase's strict liability claim and affirm its decision immunizing Badger from strict liability. Accordingly, we uphold the trial court's order granting Badger's motion to dismiss for insufficiency of the evidence.

¶ 3. The facts for the purposes of this appeal are as follows. It is undisputed that Haase has silicosis. Silicosis is caused by inhaling tiny silica particles that result from silica sand and is a devastating disease. It is also uncontested that Haase was exposed to harmful silica particles while working at the Neenah Foundry.

¶ 4. Haase began working at the Neenah Foundry in 1955. Haase held various jobs before being assigned to the rollover molding line in the late 1950s or early 1960s. He worked on the rollover molding line until approximately 1993. He also worked a job that involved cleaning burned, dried and fine sand from the basement area. He described the cleanup job as the dirtiest job he held during his forty years at Neenah. He also cleaned the pits every day for about a year. He wore a respirator while performing this work, and needed to change the filters often because they would become clogged with dirt and dust.

¶ 5. Haase then worked as a stand grinder from 1993 until his retirement in 1996. As a stand grinder, he was substantially exposed to harmful silica particles. Due to the silicosis hazard, Neenah required Haase to wear a respirator. Haase wore the government-approved 3M 8710 respirator Neenah issued to him.

¶ 6. Badger supplied silica sand to Neenah from 1980 to 1996, and it is uncontested that the silica particles to which Haase was exposed from 1993 until

1996 were from Badger's foundry sand. The sand which Badger supplied to Neenah was mined from a natural sandstone deposit, washed to remove clay and other impurities, dried and cooled, and then graded according to the grain size requested by the foundry. Nothing done in the mining, washing or milling process changed the chemical composition of the sand or otherwise altered its properties.

¶ 7. Badger issued warnings concerning potential health hazards associated with inhaling respirable silica on its invoices and other materials that accompanied bulk shipments. Also, beginning in 1988, and certain years thereafter, Badger sent its customers Material Safety Data Sheets (MSD Sheets) for its foundry sand. These data sheets warned of the dangers of the product and instructed how the product could be used safely in light of the silicosis hazard. Badger instructed that "an approved dust respirator" should be used if the air contained five times or less of the permissible exposure limit for respirable silica. "[A]n approved dust respirator" is a respirator that has been approved by the federal government for use against certain types of dust. The National Institute for Occupational Safety and Health (NIOSH) is the federal agency that issues such approvals. There are different types of "approved dust respirators." One example is the "approved dust respirator" worn by Haase from 1993 to 1996. Another type of "approved dust respirator" is one equipped with a high-efficiency filter, which provides a much higher degree of protection than a conventional filter.

¶ 8. In 1992, NIOSH issued two Alerts dealing with the proper type of respiratory protection for silica dust. In these Alerts, NIOSH recommended that only approved respirators equipped with high-efficiency fil-

ters should be used where the air contains five times or less of the permissible exposure limit for respirable silica. In 1994, NIOSH again recommended, this time in a Pocket Guide to Industrial Hazards, that an approved respirator with a high-efficiency filter should be used for up to five times the permissible exposure limit for respirable silica. Although Badger was aware of the NIOSH recommendations, Badger did not amend its MSD Sheets to reflect the NIOSH recommendations. The MSD Sheets instructed that an employee should wear "an approved dust respirator."

¶ 9. Haase filed suit against Badger and several respirator manufacturers, alleging that he contracted silicosis as a result of his workplace exposure to silica sand at Neenah. Haase asserted claims grounded in strict products liability and negligence.

¶ 10. At trial, two of Neenah's former safety directors testified, Dennis O'Brien and Thomas Shallow. O'Brien testified that Neenah was well aware of the hazards attendant to the industry. O'Brien stated that he and other managers were encouraged and trained to keep up to date on safety issues in foundry settings through attendance at government-sponsored seminars and review of literature from government agencies. O'Brien further testified that he did not rely on Badger for information concerning control of silica hazards in the foundry or methods of protecting Neenah's employees from silica exposure. Specifically, he testified that Neenah never relied on Badger for information or recommendations regarding ventilation issues, air monitoring, engineering or administrative controls, the selection of respirators, or advice concerning what areas of the plant should be designated for mandatory respirator use. O'Brien testified that he made the decision to purchase the respirator Haase wore from 1993

to 1996, the 3M 8710, after consulting with 3M representatives. He stated that he did not rely on Badger with regard to the decision, or seek its advice about this respirator. He testified that the decision about when and where to use respirators in the foundry was made by Neenah without input from Badger or reliance on any information provided by Badger. He also testified that he believed that the 3M 8710 respirator was protecting Haase from the silica dust generated by Badger's product.

¶ 11. Shallow testified that he considered Neenah to be knowledgeable, technologically advanced and a leader in the foundry industry, due in part to the various individuals in Neenah's management who are involved with the American Foundrymen's Society (AFS). As the trial court noted, Shallow indicated that he did not ever recall receiving data sheets from Badger containing information regarding the respirators, but that he believed he had reviewed Badger's MSD Sheets while at Neenah. Shallow also testified that it was his practice to look at the MSD Sheets Badger issued and compare them to prior data sheets to see if Badger had made any changes. He testified that the two primary uses in looking at amended data sheets were the hazards presented by the product and how to guard against those hazards through personal protective equipment, including through respirators. He then stated that he did not expect Badger's MSD Sheets to be 100% accurate and that if he had questions about the accuracy of the data sheets, he would call the local Occupational Safety and Health Administration (OSHA) office. He stated that he did not know Badger's instructions regarding respirators were wrong and that he believed that the 3M 8710 respirator was protecting Haase from

the silica dust. Shallow was never asked if Neenah relied on the instructions Badger gave Neenah.

¶ 12. Haase also called two expert witnesses to testify at trial. Dr. Yehia Hammad, Haase's liability expert, and Dr. Henry Anderson, Haase's medical expert, both conceded that silica sand, in its natural form, is not dangerous. Dr. Hammad testified that when Badger's foundry sand leaves its facilities, it cannot cause silicosis because the granules are too large to be inhaled into the lungs. Similarly, Dr. Anderson testified that even a very small grain of sand cannot get into the lungs; it has to be very fine and so small that it cannot be seen with the naked eye. Both experts acknowledged that in order for the sand to be respirable and, therefore, potentially harmful to the lungs, it needed to be broken into smaller particles, which occurs during the foundry's manufacturing processes. Dr. Hammad also testified that the respirator Haase used leaked approximately fifty percent of the harmful silica particles that were in and around Haase at any particular point in time. He stated that if a respirator with a high-efficiency filter had been used; only three particles out of 10,000 would have leaked through because such filters are 99.97% effective.

¶ 13. At the close of Haase's case-in-chief, Badger moved for dismissal, pursuant to Wis. Stat. § 805.14(3) (2001–02), on the grounds of insufficiency of the evidence. Badger gave the trial court a copy of the district court opinion in *Bergfeld*,[1] which had been released (the appellate opinion in *Bergfeld* was obviously released at a later date). The trial court concluded that, considering all credible evidence and reasonable infer-

[1] *Bergfeld v. Unimin Corp.*, 226 F. Supp. 2d 970 (N.D. Iowa 2002).

ences in the light most favorable to Haase, there was no credible evidence to sustain a finding in Haase's favor on any of his claims.

¶ 14. Relying on the *Bergfeld* district court opinion, the trial court determined that Neenah was a sophisticated user of Badger's sand, noting that it had long been aware of, and taken steps to ameliorate, the risk of silicosis to its employees. The court determined that Badger could not be found liable for failing to warn Haase of potential silica hazards associated with its sand because it legitimately expected Neenah, a sophisticated user of the sand, to institute the necessary safety precautions based on its specific use of Badger's sand. The court noted that as an employer, Neenah was obligated to provide a safe workplace for its employees, and was in a far better position than a remote sand supplier to ascertain what employees were at risk for exposure to silica dust and to warn these employees of such risks. Accordingly, the court held that Badger had no duty to warn Neenah of silica hazards.

¶ 15. Relying, in part, on Dr. Anderson's testimony and applying RESTATEMENT (THIRD) OF TORTS § 5 (1998), the trial court also rejected Haase's strict products liability claims against Badger. Finally, the court concluded that even if Badger had a duty to warn and that duty was somehow breached, Haase failed to establish a causal effect between the lack of a warning and the injuries or harm he suffered. The court determined that Haase's proof against Badger as to causation rested entirely on conjecture and speculation and the jury should not and would not be asked to speculate as to causation. Haase appeals.

¶ 16. When a motion for a directed verdict based on the sufficiency of the evidence is made in the trial

court, that motion shall not be granted unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom it is made, there is no credible evidence to sustain a finding in favor of such party. *Weiss v. United Fire and Cas. Co.*, 197 Wis. 2d 365, 388, 541 N.W.2d 753 (1995). On review, this court must apply the same standard and a trial court will not be reversed unless the decision is clearly wrong. *Id.* at 388–89. This "clearly wrong standard and the "any credible evidence standard are not two different standards, but only flip sides of the same coin. A trial court is "clearly wrong when it grants a motion for a directed verdict despite the existence of credible evidence to the contrary.

¶ 17. Haase first argues that the trial court erred in holding that Badger did not have a duty to warn Neenah about the silicosis hazard inherent in Badger's product or the steps necessary to avoid this hazard. Haase contends that the trial court erred in concluding that the sophisticated user defense is available in Wisconsin, arguing that *Bergfeld* and the sophisticated user defense are contrary to well-established Wisconsin products liability law. In the alternative, Haase argues that even if we adopt *Bergfeld*, it is "easily distinguishable" from this case. We, therefore, begin our discussion with an analysis of the *Bergfeld* decision.

¶ 18. Bergfeld worked in a foundry and developed silicosis as a result of many years of exposure to silica sand on the job. *Bergfeld*, 319 F.3d at 352. The MSD Sheets the supplier had provided described silica as "nontoxic." *Id.* Bergfeld filed a products liability claim against the foundry. *Id.* Bergfeld claimed that the foundry's supplier of silica sand failed to warn either him or the foundry of the risk of silicosis associated

with exposure to silica dust concentrations below the maximum level permitted by OSHA regulations, which he conceded the foundry had knowledge of, but above the maximum level recommended by NIOSH. *Id.* at 353. The Eighth Circuit Court of Appeals concluded that the foundry was a sophisticated user and, as a matter of law, the bulk supplier had no duty to warn the foundry of the risks posed by excessive exposure to silica sand. *Id.* at 352.

¶ 19. In reaching its conclusion, the court explained that Iowa had adopted § 388 of the RESTATEMENT (SECOND) OF TORTS (1965) regarding a manufacturer's duty to warn of the dangers associated with the use of products. *Bergfeld*, 319 F.3d at 353. The court noted that § 388 provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

*Bergfeld*, 319 F.3d at 353; *see also* RESTATEMENT (SECOND) OF TORTS § 388 (1965). The court explained that subsec.

(b) embodies the sophisticated user doctrine, which had been described as imposing "no duty to warn if the user knows or should know of the potential danger, especially when the user is a professional who should be aware of the characteristics of the product." *Bergfeld*, 319 F.3d at 353 (citations omitted).

¶ 20. The court then rejected Bergfeld's argument that the foundry was insufficiently sophisticated because it did not know of and did not implement safeguards to reduce exposure levels to the NIOSH recommended level. *Id.* at 354. The court reasoned that the foundry's manager of industrial hygiene at the time served as the foundry's representative to the AFS and had reviewed NIOSH publications and that another industrial hygienist at the foundry had knowledge of the NIOSH recommendation through professional publications. *Id.* The court concluded that the foundry was familiar with the NIOSH recommendation, but simply chose not to adopt it. *Id.*

¶ 21. In the instant case, the first issue we must address is whether *Bergfeld* and its sophisticated user defense are good law in Wisconsin. Like Iowa, Wisconsin has adopted RESTATEMENT (SECOND) OF TORTS § 388 (1965), which, as the Eighth Circuit recognized, "embodies the sophisticated user doctrine." *Bergfeld*, 319 F.3d at 353; *see also Strasser v. Transtech Mobile Fleet Serv., Inc.*, 2000 WI 87, ¶ 58, 236 Wis. 2d 435, 613 N.W.2d 142. Further, after reviewing Wisconsin cases discussing § 388, the federal district court for the western district of Wisconsin has recognized that it is likely that the Wisconsin Supreme Court would adopt some form of the sophisticated user doctrine. *Nigh v. Dow Chem. Co.*, 634 F. Supp. 1513, 1517 (W.D. Wis. 1986). This was, in part, because it is well established in

Wisconsin that "there is no duty to warn members of a trade or profession about dangers generally known to the trade or profession." *Shawver v. Roberts Corp.*, 90 Wis. 2d 672, 686, 280 N.W.2d 226 (1979); *see also Nigh*, 634 F. Supp. at 1517 (concluding that *Shawver*, 90 Wis. 2d at 686, supported its determination that the sophisticated user defense was consistent with Wisconsin law). Finally, we note that sound policy reasons support the adoption of the sophisticated user defense. First, it places the duty to warn on the party arguably in the best position to ensure workplace safety, the purchaser-employer. Second, the burden falls upon the party in the best position to know of the product's potential uses— thereby enabling that party to communicate safety information to the ultimate user based upon the specific use to which the product will be put. For the foregoing reasons, we adopt *Bergfeld* and its discussion of the sophisticated user defense.

¶ 22. Haase argues that *Bergfeld* is easily distinguishable from this case for two reasons. Haase claims that in *Bergfeld*, there was no question as to whether the foundry was a sophisticated user and, here, there was credible evidence demonstrating that Neenah was not a sophisticated user. Next, Haase asserts that unlike the sand supplier in *Bergfeld*, Badger voluntarily assumed the duty to provide accurate safe-use instructions by giving Neenah data sheets containing instructions on the type of respirator necessary to avoid silicosis and that credible evidence in the record demonstrates that Neenah relied on those instructions in making its decisions on which respirators to use. We address these arguments in turn.

¶ 23. Haase submits that unlike the foundry in *Bergfeld*, Neenah was insufficiently sophisticated. Haase concedes that Neenah possessed general knowl-

edge concerning silicosis and the need for respirators, but was not sophisticated enough to know that the respirators recommended by Badger offered insufficient levels of protection. The record, however, belies Haase's assertions.

¶ 24. From our review of the record, it is clear that Neenah had extensive knowledge of the hazards of inhaling silica dust, the disease of silicosis and the proper dust control methods. The record demonstrates that Neenah is a knowledgeable employer within a knowledgeable industry. Neenah has been in the foundry business for more than 120 years. During much of that time, Neenah managers have been members of the AFS and have frequently attended AFS meetings and seminars where they received literature about foundry hazards and worker protection.[2] Both former safety directors who testified at trial acknowl-

---

[2] The American Foundrymen's Society is a foundry trade organization that was established in the United States more than 100 years ago. Since its inception, it has prepared and distributed literature addressing foundry hazards, including silica exposure, to its members. The widespread knowledge of silicosis as a work-related disease was further substantiated at trial by exhibits related to a National Silicosis Conference held in 1937. The Conference featured the film, "Stop Silicosis." According to Badger, it depicted men working in various dusty trades, including foundries, and described how workers could be protected from overexposure to silica. Committees were formed at the Conference and directed to address the medical, engineering, economic and administrative aspects of this silica-related disease that was affecting many of the country's workers. The National Silicosis Conference Summary Report released in 1937 directly addressed silicosis prevention in industrial settings, recommending measures for employers to take on behalf of their workers. Among the recommendations

edged that Neenah was well aware of the hazards attendant to the industry. Also, Shallow testified that he considered Neenah to be knowledgeable, technologically advanced and a leader in the foundry industry. Furthermore, the record demonstrates that Neenah dedicated significant time and resources towards keeping abreast of industry safety standards and changes in government regulations; improving ventilation and dust collection systems in the foundry; purchasing respiratory protective equipment, including air-fed helmets and high-efficiency filter respirators for employees working in areas where silica levels could not be reduced below regulations; training employees in recognizing hazards and protecting themselves from those hazards; and medically monitoring employees who had been exposed to silica. The evidence in the record shows that, for whatever reason, Neenah chose not to require its employees to wear the high-efficiency respirators, but it did not show that Neenah was unfamiliar with them or that Neenah was unsure of how to adequately protect its workers. No credible evidence has been provided to the contrary. We therefore conclude that Neenah was a sophisticated user of silica sand and, as a consequence, it was entirely reasonable for Badger to expect that Neenah would institute the necessary safety precautions based on its own specific use of Badger's sand.

¶ 25. Next, Haase asserts that by providing Neenah with the MSD Sheets, Badger had voluntarily assumed the duty to provide accurate safe-use instructions and Neenah relied on Badger's MSD Sheets in

were workplace surveys, compliance with laws and regulations, respiratory protection and employee safety training.

986

making its decisions on which respirators to use. However, once again, Haase fails to identify any facts introduced at trial that support his assertion. There is no evidence that Badger took it upon itself to give specific guidance on the kind of respirator Neenah was to use. The MSD Sheets simply warned Neenah of the dangers of silicosis and advised that its employees should wear government-approved respirators. Further, O'Brien, the safety coordinator and safety director for over a decade, testified that Neenah never relied on Badger in any way in making decisions to use certain respirators. O'Brien testified that he made the decision to purchase the 3M 8710, the respirator worn by Haase between 1993 and 1996, after consulting with 3M representatives. He did not speak with Badger about the decision or seek its advice about the government-approved respirator. Furthermore, contrary to Haase's assertions, Shallow never testified that Neenah actually relied on the information from Badger in making its determinations about respirators. Although he indicated that he did review the MSD Sheets Badger provided, Shallow stated that he did not expect the MSD Sheets to be 100% accurate when he received them, and if he had any questions about the accuracy of the MSD Sheets, he would contact the local OSHA office. We, therefore, reject Haase's attempts to distinguish this case from *Bergfeld* and conclude that the trial court was not clearly wrong in granting Badger's motion for a directed verdict on his negligence claims.

¶ 26. We now move from the negligence cause of action to the strict liability claim. Haase argues that the trial court erred in holding that Badger was immune from a strict products liability claim pursuant to RESTATEMENT (THIRD) OF TORTS § 5 (1998). He contends that the trial court should have applied the product-liability

test embodied in RESTATEMENT (SECOND) OF TORTS § 402A (1965). Haase argues that had the trial court applied § 402A, as is required by law, the court would have come to a different conclusion. He submits that the foundry sand Badger supplied to Neenah was defective and unreasonably dangerous from the standpoint of an ordinary consumer.

¶ 27. Even if we apply RESTATEMENT (SECOND) OF TORTS § 402A (1965), as Haase asks us to do, his strict liability claim would not succeed. To establish a claim under § 402A, a plaintiff must prove:

> (1) that the product was in a defective condition when it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause of . . . the plaintiff's injuries or damages, (4) that the seller engaged in the business of selling such product . . . and (5) that the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was when he [or she] sold it.

*Green v. Smith & Nephew AHP, Inc.*, 2001 WI 109, ¶ 23, 245 Wis. 2d 772, 629 N.W.2d 727. The defective condition and unreasonably dangerous requirements, while separate, are based on the hypothesis that the product is dangerous to an extent beyond that which would be contemplated by an ordinary consumer. RESTATEMENT (SECOND) OF TORTS § 402A cmt. i (1965); *see also Green*, 245 Wis. 2d 772, ¶ 29.

¶ 28. Although Haase attempts to belittle the trial court for comparing the silica sand Badger sold to Neenah to the sand used in sand boxes or on golf courses, the bottom line is that the sand Badger supplies is a raw material and in its natural form is not unreasonably dangerous. According to Dr. Anderson,

the plaintiff's own expert, a grain of silica sand is too large to get into the lungs and the sand particles must be made very small or fine in order to become respirable and harmful. Dr. Anderson testified that the sand is fractured by the foundry's own processing of the sand and it is this fracturing that produces the smaller, finer particles that make the sand dangerous. Badger merely takes the sand from the earth, washes the sand, sizes the sand and delivers it to its customers. Haase points us to no evidence in the record demonstrating that the sand is in any way dangerous at the time it is delivered by Badger. Accordingly, from the evidence in the record, we cannot see how the application of RESTATEMENT (SECOND) OF TORTS § 402A (1965) would have changed the outcome of the case.

¶ 29. Furthermore, we are convinced that the trial court was not in error when it adopted and applied RESTATEMENT (THIRD) OF TORTS § 5 (1998). Contrary to Haase's assertions, § 5 is the logical extension of RESTATEMENT (SECOND) OF TORTS § 402A (1965). Section 5 is titled "Liability of Commercial Sellers or Distributors of Product Components For Harm Caused by Products Into Which Components Are Integrated" and provides:

> One engaged in the business of selling or otherwise distributing product components who sells or distributes a component is subject to liability for harm to persons or property caused by a product into which the component is integrated if:
>
> (a) the component is defective in itself, as defined in this Chapter, and the defect causes the harm; or
>
> (b)(1) the seller or distributor of the component substantially participates in the integration of the component into the design of the product; and

(2) the integration of the component causes the product to be defective, as defined in this Chapter; and

(3) the defect in the product causes the harm.

Comment c to § 5 states that the term "product components" includes raw materials, such as sand. The comment recognizes that a basic raw material cannot be defectively designed. "Inappropriate decisions regarding the use of such materials are not attributable to the supplier of the raw materials but rather to the fabricator that puts them to improper use . . . . Accordingly, raw materials sellers are not subject to liability for harm caused by defective design of the end-product." RESTATEMENT (THIRD) OF TORTS § 5 cmt. c (1998). The comment then applies the same considerations to failure-to-warn claims stating that "[t]o impose a duty to warn would require the seller to develop expertise regarding a multitude of different end-products and to investigate the actual use of raw materials by manufacturers over whom the supplier has no control. Courts uniformly refuse to impose such an onerous duty to warn." *Id.* This mirrors § 402A's defective condition and unreasonably dangerous elements, which require the product to be dangerous beyond the extent contemplated by the ordinary consumer who purchases it. In essence, § 5 recognizes that a raw material such as sand is inherently safe in its design and is not an unreasonably dangerous product.

¶ 30. Haase notes that in *Green*, 245 Wis. 2d 772, ¶¶ 72–73, our supreme court refused to adopt § 2(b) of the RESTATEMENT (THIRD) OF TORTS (1998) and implies that this translates into an outright rejection on the part of the supreme court of the RESTATEMENT (THIRD) OF TORTS. *Green* cannot be read so broadly. In *Green*, the court was asked to adopt RESTATEMENT (THIRD) OF TORTS

§ 2(b), which incorporates an element of foreseeability of the risk of harm in and a risk-benefit test in products liability analysis. *Green*, 245 Wis. 2d 772, ¶ 72. The court rejected § 2(b) as being fundamentally at odds with current Wisconsin products liability law, which analyzed claims using the consumer-contemplation test set forth in § 402A. *Green*, 245 Wis. 2d 772, ¶ 72. However, as we have explained, the principles and tenets embodied in RESTATEMENT (THIRD) OF TORTS § 5 (1998) complement those of RESTATEMENT (SECOND) OF TORTS § 402A (1965). Hence, we conclude that the trial court correctly applied § 5.

¶ 31. RESTATEMENT (THIRD) OF TORTS § 5(a) and (b)(1) are written in the disjunctive and essentially provide exposure for a supplier when the product is defective or when the seller substantially participates in the end-product. As is clear from our previous discussion, neither of these two elements is present here. The silica sand Badger supplies Neenah is a naturally occurring raw material. Further, Badger does not participate in Neenah's processing of the silica sand. Accordingly, we uphold the trial court's dismissal of Haase's strict liability claim.

*By the Court.*—Order affirmed.