Laverne HAASE, Plaintiff-Appellant-Petitioner,

Larry BRAATZ, Norb Braun, Fidel Castillo, Gregory Ebel, Lawrence Ferge, Leon Fuerst, Carol Guyette, Estate of Ray Guyette, David Hamilton, Floyd Hanson, Jerald Heuer, Daniel Janiak, Rick Knudsen, Wesley Kupsky, Sr., James Mohrman, James Maroney, Terry Olejnik, Robert Parry, Donald Quaintance, Delores Radtke, Estate of Marvin Radtke, Candelario Rodriguez, Dale Sittman, Alois Steger, John Stilp, William Surprise, Jacob Vertz, Richard Weber and Arthur Zinkel, Plaintiffs,

v.

BADGER MINING CORPORATION, Defendant-Respondent,

MINE SAFETY APPLIANCES COMPANY, Minnesota Mining & Manufacturing, North Safety Products Company, The Norton Company, Textron Inc., Liberty Mutual Insurance Company, Travelers Casualty and Surety, American Optical Corporation, Dalloz Safety Inc. and Employers Insurance Company of Wausau, Defendants.

Supreme Court

*No. 02–1681. Oral argument April 26, 2004.—Decided July 2, 2004.*

143

**2004 WI 97**

(Also reported in 682 N.W.2d 389.)

For the plaintiff-appellant-petitioner there were briefs by *Brian Hamill, Ronald L. Lampe* and *Dempsey, Williamson, Young, Kelly & Hertel, LLP,* Madison; and *Louis L. Plotkin, Rodney P. Vincent* and *Gertler, Gertler, Vincent & Plotkin, LLP,* New Orleans, LA, and oral argument by *Louis L. Plotkin.*

For the defendant-respondent there were briefs by *Michael J. Cohen, Catherine R. Grogan* and *Meissner Tierney Fisher & Nichols, S.C.,* Milwaukee; and *Cathy R. Gordon* and *Swartz Campbell LLC,* Pittsburgh, PA, and oral argument by *Cathy R. Gordon.*

An amicus curiae brief was filed by *Jeffrey O. Davis, Nora M. Platt, O. Thomas Armstrong* and *Quarles & Brady LLP,* Milwaukee, on behalf of Wisconsin Manufacturers & Commerce.

An amicus curiae brief was filed by *Tene S. Davis* and *Shook, Hardy & Bacon, L.L.P.,* Kansas City, MO; and *Victor E. Schwartz, Leah Lorber, Kimberly D. Sandner* and *Shook, Hardy & Bacon, L.L.P.,* Washington, D.C., on behalf of Coalition for Litigation Justice, Inc.

¶ 1. ANN WALSH BRADLEY, J. The petitioner, Laverne Haase, seeks review of a decision of the court of appeals that affirmed an order of the circuit court dismissing his products liability claim against Badger Mining Corporation.[1] Haase contends that the court of appeals erred in adopting and applying Restatement (Third) of Torts § 5 (1998) and using it as the basis to defeat his strict liability claim. Additionally, he maintains that he presented sufficient evidence for a strict liability claim under Restatement (Second) of Torts § 402A (1965).

¶ 2. We agree with Haase that Restatement (Third) of Torts § 5 (1998) is inapplicable to the case at hand. However, we disagree with his assertion that he presented sufficient evidence to support a strict liability claim under Restatement (Second) of Torts § 402A (1965). Because we determine that Badger's product, silica sand, underwent a material and substantial change after leaving its possession, we conclude that Badger cannot be held strictly liable. Accordingly, we affirm the decision of the court of appeals.

---

[1] *Haase v. Badger Mining Corporation,* 2003 WI App 192, 266 Wis. 2d 970, 669 N.W.2d 737 (affirming an order of the circuit court for Winnebago County, Bruce K. Schmidt, Judge).

147

## I

¶ 3. Haase was employed at the Neenah Foundry from 1955 to 1996. In 1999, he was diagnosed with silicosis, a lung disease caused by prolonged inhaling of silica particles. It is undisputed that Haase was exposed to harmful silica particles while working at Neenah.

¶ 4. Upon learning his diagnosis, Haase filed suit against Badger and several respirator manufacturers, alleging that he had contracted silicosis as a result of his exposure to silica sand at Neenah.[2] Because Badger's sand is central to this case, it is important to understand where it comes from, how it was used at Neenah, and the nature of Haase's exposure to it.

¶ 5. From 1980 to 1996, Badger supplied silica sand to Neenah. Badger begins its process of mining sand by drilling holes in the earth to locate sandstone. After locating the sandstone, Badger uses various techniques to loosen it, such as blasting, drilling, and ripping. It then places the crushed sandstone in a slurry box with water to remove clays and other impurities. The sand, which is over 99% pure silica, is dried in large kilns. After cooling, Badger screens and blends the sand so that its size conforms to its customers' specifications.

¶ 6. At Neenah, the silica sand is mixed with benonite, clay, and sea coal and compressed into molds. Molten iron is then poured into these molds to create iron castings, such as manhole covers. Once the molten metal cools and solidifies, the mold is broken apart and the casting comes out. The compacted sand surrounding the casting is vibrated, shaken out, and often reused in the process. The castings, meanwhile, go through a shot blast process where BB's are fired at them to

---

[2] The respirator manufacturers settled with Haase prior to trial.

remove any excess sand. Workers remove additional burned sand from the castings by grinding it off with machines.

¶ 7. During his tenure at Neenah, Haase held several positions. From 1955 to 1993, he worked in the molding department. This is where the silica sand is compressed into molds for the iron castings. While working on the rollover molding line, Haase was not required to wear a respirator and did not wear one.

¶ 8. In addition to the rollover molding line, Haase periodically worked on the cleanup crew. There, he would shovel and sweep excess silica sand and dust left over from the foundry process. Haase would also shovel sand down in pits where there was a large amount of fine, black dust. At trial, he explained that this was very dusty work and at times he could not even see the end of his shovel. Haase stated that he wore a respirator when working cleanup.

¶ 9. Finally, from 1993 until his retirement in 1996, Haase worked as a grinder. He would grind burned silica sand and other imperfections off the iron castings. Again, he testified that this was a dusty job and that he wore a respirator at all times while working.

¶ 10. Haase asserted two theories of liability in his case against Badger: negligence and strict liability.[3] At the close of his case-in-chief, Badger moved for dismissal based on insufficiency of the evidence. The circuit court granted the motion.

¶ 11. In dismissing Haase's strict liability claim against Badger, the circuit court relied on Haase's own

---

[3] On review to this court, Haase challenges only the circuit court's dismissal of his strict liability claim. Therefore, we do not address any issues regarding his negligence claim.

expert witnesses, Dr. Henry Anderson and Dr. Yehia Hammad. Both experts acknowledged that when the silica sand left Badger, it could not cause silicosis because the granules were too large to be inhaled.

¶ 12. The circuit court also adopted and applied the Restatement (Third) of Torts § 5 (1998). It reasoned that because a raw material such as silica sand could not be defectively designed, Badger could not be held strictly liable. In reaching this conclusion, the circuit court correctly recognized that Wisconsin courts had yet to adopt the Restatement (Third) of Torts § 5 (1998).

¶ 13. The court of appeals affirmed the dismissal of Haase's claims. Like the circuit court, the court of appeals adopted and applied the Restatement (Third) of Torts (1998) § 5. *Haase v. Badger Mining Corporation,* 2003 WI App 192, ¶ 29, 266 Wis. 2d 970, 699 N.W.2d 737. It observed that "§ 5 is the logical extension of Restatement (Second) of Torts § 402A (1965)." *Id.* The court explained, "[i]n essence, § 5 recognizes that a raw material such as sand is inherently safe in its design and is not an unreasonably dangerous product." *Id.*

¶ 14. Additionally, the court of appeals concluded that Haase's strict liability claim would have failed even if the circuit court had applied the Restatement (Second) of Torts § 402A (1965). *Id.,* ¶ 27. The court emphasized the testimony of Haase's expert witnesses, who noted that Badger's sand was too large to become respirable and harmful in its natural form. *Id.,* ¶ 28. Accordingly, it determined that there was no evidence that the sand was in any way unreasonably dangerous at the time Badger delivered it to Neenah. *Id.*

## II

■

¶ 15. A motion challenging the sufficiency of the evidence may be granted when "the court is satisfied that, considering all credible evidence in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such a party." *Weiss v. United Fire and Casualty Co.,* 197 Wis. 2d 365, 388, 541 N.W.2d 753 (1995) (quoting Wis. Stat. § 805.14(1)).

■

¶ 16. In ruling upon a motion made at the close of a plaintiff's case, a circuit court may grant the motion if it finds, as a matter of law, that no jury could disagree on the proper facts or inferences to be drawn therefrom, and that there is no credible evidence to support a verdict for the plaintiff. *Id.* (citing *American Family Mut. Ins. Co. v. Dobrzynski,* 88 Wis. 2d 617, 625, 277 N.W.2d 749 (1979)).

■

¶ 17. Because circuit courts are better positioned to decide the weight and relevancy of the testimony, we accord them substantial deference. *Id.* at 388–89 (citing *James v. Heintz,* 165 Wis. 2d 572, 577, 478 N.W.2d 31 (Ct. App. 1991)). Thus, we will not overturn a circuit court's decision to dismiss for insufficient evidence unless the record reveals that it was "clearly wrong." *Id.* at 389 (quoting *Helmbrecht v. St. Paul Ins. Co.,* 122 Wis. 2d 94, 110, 362 N.W.2d 118 (1985)). A circuit court is "clearly wrong" when it grants a motion to dismiss despite the existence of "any credible evidence" to support the claim. *See id.*

¶ 18. This case presents us with two issues. First, we must decide whether the court of appeals erred in adopting and applying the Restatement (Third) of Torts § 5 (1998). Second, we must determine whether Haase presented sufficient evidence for a strict liability claim under Restatement (Second) of Torts § 402A (1965).

¶ 19. Our discussion begins with an examination of the Restatement (Third) of Torts § 5 (1998). Section 5 is entitled "Liability of Commercial Sellers or Distributors of Product Components For Harm Caused by Products Into Which Components Are Integrated" and provides:

> One engaged in the business of selling or otherwise distributing product components who sells or distributes a component is subject to liability for harm to persons or property caused by a product into which the component is integrated if:
>
> (a) the component is defective in itself, as defined in this Chapter, and the defect causes the harm; or
>
> (b)(1) the seller or distributor of the component substantially participates in the integration of the component into the design of the product; and
>
> (2) the integration of the component causes the product to be defective, as defined in this Chapter; and
>
> (3) the defect in the product causes harm.

¶ 20. Haase contends that the court of appeals erred in adopting this rule and using it as the basis to defeat his strict liability claim. Specifically, he asserts § 5 is inapplicable to his case because it concerns claims

involving component parts of finished products where the finished product is alleged to have caused harm. Haase argues that Badger's silica sand was not a component part of Neenah's finished product (the metal casting). Moreover, he maintains that Neenah's finished product did not cause his lung disease.

¶ 21. We agree with Haase that § 5 is inapplicable here. To begin, Badger's silica sand was not a component part because it was not integrated into Neenah's finished products. This conclusion is supported by a comment to the rule, which notes that "[p]roduct components include raw materials, bulk products, and other constituent products sold for *integration into* other products." Restatement (Third) of Torts (1998) § 5 cmt. a (emphasis added).

¶ 22. Furthermore, Badger's silica sand did not cause the metal casting to be defective as required by § 5(b)(2). Rather, it was the sand itself that was allegedly defective. *See* Restatement (Third) of Torts (1998) § 5(b)(2). Finally, the § 5(b)(3) requirement cannot be met because no defect in the metal castings caused Haase's silicosis. *See* Restatement (Third) of Torts (1998) § 5(b)(3).

¶ 23. Although we recognize that Restatement (Third) of Torts may offer new insights into strict liability law, we decline to adopt § 5 here as it is inapplicable to the facts of this case. Because we determine that it is inapplicable, the decision of the court of appeals should not be cited for the proposition that Wisconsin has adopted Restatement (Third) of Torts § 5 (1998). Thus, the status of Restatement (Third) of Torts § 5 (1998) in Wisconsin is that we have neither adopted nor rejected it.

## IV

¶ 24. We turn next to the issue of whether Haase presented sufficient evidence for a strict liability claim under Restatement (Second) of Torts § 402A (1965). That section provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

■

¶ 25. To establish a strict liability claim under this rule, a plaintiff must prove all of the following elements:

(1) that the product was in defective condition when it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause . . . of the plaintiff's injuries or damages, (4) that the seller engaged in the business of selling such product, or, put negatively, that this is

154

not an isolated or infrequent transaction not related to the principal business of the seller, and (5) that the product was one which the seller expected to and did reach the user or consumer *without substantial change* in the condition it was when he sold it.

*Dippel v. Sciano,* 37 Wis. 2d 443, 460, 155 N.W.2d 55 (1967) (emphasis added).

■

¶ 26. A central dispute in this case is whether there was a change in the silica sand after leaving Badger's control to warrant a dismissal for strict liability. Accordingly, we begin our analysis with the fifth element, which includes this "substantial change" doctrine. If the evidence shows that there was a substantial change in the product after it left the seller, then the strict liability claim fails because all five elements must be met.

¶ 27. The seminal case in Wisconsin explaining what constitutes a "substantial change" for the purposes of strict liability actions is *Glassey v. Continental Insurance Company,* 176 Wis. 2d 587, 500 N.W.2d 295 (1993). There, a worker was injured when a screw-on cap blew off of a pressurized spray tank and struck him in the forehead. *Id.* at 593. Prior to the accident, the tank's original filler cap had been replaced with a non-standard "plumbers cap." *Id.* at 595. The circuit court held that the substantial change to the tank barred a strict liability claim as a matter of law. *Id.* at 594.

¶ 28. After reviewing the evidence, the court of appeals agreed with the circuit court's dismissal of Glassey's claim. *Id.* at 600. It concluded that "[m]anufacturers or sellers cannot be held strictly liable if the condition of the product substantially changes in a way

that is material to the accident after the product leaves their control." *Id.* In doing so, the court defined a substantial and material change as "a change in the design, function or character of the product linked to the accident." *Id.*

¶ 29. The decision in *Glassey* was based heavily on an analysis of the public policy grounds that underlie the rule of strict liability as set forth in *Dippel.* The focus of the analysis lies in the allocation of risk:

'The reason, which has been reiterated most often, is that the seller is in the paramount position to distribute the costs of the risks created by the defective product he is selling. He may pass the cost on to the consumer via increased prices. He may protect himself either by purchasing insurance or by a form of self-insurance. In justification of making the seller pay for the risk, it is argued that the consumer or user has the right to rely on the apparent safety of the product and that it is the seller in the first instance who creates the risk by placing the defective product on the market. A correlative consideration, where the manufacturer is concerned, is that the manufacturer has the greatest ability to control the risk created by his product since he may initiate or adopt inspection and quality control measures thereby preventing defective products from reaching the consumer.'

*Id.* at 602–03 (quoting *Dippel,* 37 Wis. 2d at 450–51).

¶ 30. The court explained that such policies "are not promoted by imposing the strict liability rule when a substantial and material change is made to a product after it leaves the control of the manufacturer or seller." *Id.* at 603. On the contrary, "[t]he party in the best position to pay for the cost of changes to products is the party who makes the changes." *Id.* Furthermore, "[i]nspection and quality control measures will not prevent changes made to the product after it leaves the manu-

facturer or sellers control." *Id.* For these reasons, the court determined that "[i]n situations where the product has undergone a substantial change by a third party, the policy of compensating persons injured by dangerous products is more equitably served by common law negligence rules." *Id.*

¶ 31. Haase contends that Badger's product did not undergo a substantial and material change because its silica content remained the same throughout the foundry process. He notes that Neenah did not change the amount of silica in Badger's sand. Rather, Haase maintains that Badger controlled it, intentionally creating a product that was almost 100% pure silica.

¶ 32. The problem with Haase's argument is that the evidence reveals that the very characteristic which made Badger's silica sand dangerous, its respirability, did not arise until the sand had been fractured into dust by Neenah during the foundry process. This fact was confirmed by his expert witnesses at trial:

¶ 33. Dr. Yehia Hammad, a certified industrial hygienist, testified that when Badger's sand leaves its facilities, it cannot cause silicosis because the granules are too large and not in the size range that can be inhaled into the lungs. He explained, "That's like all of us sitting on the beach with respirators . . . because the sand is very large and cannot get into our lungs."

¶ 34. Similarly, Haase's medical expert, Dr. Henry Anderson, testified that even a very small grain of sand cannot get into the lungs. He noted that the sand had to be very fine and so small that it cannot be seen with the naked eye. Thus, both experts acknowledged that for the sand to be respirable and potentially harmful to the lungs, it must be fractured into smaller particles. This occurred during processes at Neenah.

██

¶ 35. Nevertheless, Haase attempts to minimize the significance of this evidence. He argues that when a product is substantially changed before it reaches the plaintiff, the question becomes whether the manufacturer expected (or could have objectively foreseen) such a change. If so, Haase insists that strict liability may then apply.

¶ 36. Haase asserts that Badger expected the sand to undergo a substantial change and foresaw that respirable silica particles would be created from its product. He complains that the court of appeals failed to consider Badger's expectation that its sand would be changed into a respirable form.

¶ 37. For support, Haase relies on the third circuit case of *Whitehead v. St. Joe Lead Company, Inc.,* 729 F.2d 238 (3rd Cir. 1984). In *Whitehead,* the court reversed a district court's summary judgment order denying a plaintiff relief in a duty to warn case.[4] *Id.* at 241. The defendants maintained that the plaintiff was not entitled to relief because the lead ingots supplied to the plaintiff's employer had undergone a substantial change when they were converted to airborne and particulate lead during the employer's manufacturing processes. *See id.* at 249–50.

¶ 38. In reversing the summary judgment order, the court explained that under New Jersey law the general substantial change rule "is limited to changes for which it is not foreseeable that the alteration will cause injury." *Id.* at 250. It concluded that New Jersey

---

[4] At oral argument, counsel for Haase clarified that he was not raising a duty to warn argument in this review.

followed a rule that exposed a manufacturer to strict liability if that manufacturer could foresee the change that would cause the user/consumer harm. *Id.* The court explained:

> In this case it was objectively foreseeable that lead particles would be generated by Alpha's use of lead ingot. The fact that defendants supplied lead in ingot form, rather than in the form of airborne particles or metal fines, is of no consequence. The law of torts does not turn on such nice distinctions of physical chemistry. . . . The relevant question is whether the production of airborne and particulate lead was a foreseeable consequence of Alpha's operations.

*Id.* (citation omitted).

¶ 39. Haase's reliance on *Whitehead* is misplaced. We do not follow the foreseeability rule adopted by the New Jersey courts and applied in the *Whitehead* decision. In fact, the New Jersey rule was advanced by the plaintiff in *Glassey,* and we expressly rejected it:

> Glassey urges that the rule to be applied in Wisconsin should be that 'a subsequent change in a product will not relieve a manufacturer from strict liability unless the subsequent alteration itself created the defect that constituted the sole cause of injury, and the change was not reasonably foreseeable by the manufacturer.' Glassey cites *Soler v. Castmaster, Division of H.P.M. Corp.,* 484 A.2d 1225 (N.J. 1984), in support of this rule.

> We reject this rule because it does not promote the policies that underlie the imposition of strict products liability on a manufacturer or seller. . . . *Foreseeability is not an element considered in strict products liability claims, but instead is an element of negligence.*

*Glassey,* 176 Wis. 2d at 604 (emphasis added).

¶ 40. Importantly, *Soler* relied on *Whitehead* for the proposition that a manufacturer can be held strictly

liable if the substantial change is foreseeable. *See Soler*, 484 A.2d at 1232. By explicitly rejecting *Soler*, we have implicitly rejected *Whitehead* for this proposition.

¶ 41. Thus, even if we look past the fact that it was a duty to warn case, *Whitehead* is distinguishable because it rests on legal principles contradictory to Wisconsin law. We have reiterated these principles before: "*Glassey* underscored that '[f]oreseeability is not an element considered in strict liability claims.' . . . We cannot fathom that this holding could be clearer." *Green v. Smith Nephew A.H.P., Inc.*, 2001 WI 109, ¶ 68, 245 Wis. 2d 772, 629 N.W.2d 727 (citation omitted). We take this opportunity to reiterate them once again.[5]

¶ 42. In the end, we determine that the evidence here reflects that Badger's sand underwent a substantial change for the purposes of § 402A. As a result, we are satisfied that the circuit court's decision to dismiss Haase's claim was not "clearly wrong" because there was no credible evidence to sustain a finding in his favor.

## V

¶ 43. In sum, we agree with Haase that Restatement (Third) of Torts § 5 (1998) is inapplicable to the case at hand. However, we disagree with his assertion that he presented sufficient evidence to support a strict

---

[5] Although Wisconsin has rejected the forseeability rule, we do note that the authors of Restatement (Second) of Torts § 402A (1965) took no position on the issue. In a caveat to the Restatement, they wrote:

The Institute expresses no opinion as to whether the rules stated in the Section may not apply . . . (2) to the seller of a product expected to be processed or otherwise substantially changed before it reaches the user or consumer . . .

liability claim under Restatement (Second) of Torts § 402A (1965). Because we determine that Badger's product, silica sand, underwent a material and substantial change after leaving its possession, we conclude that Badger cannot be held strictly liable. Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.